**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**LINDA ATKINSON**                                                                                      **PLAINTIFF**

**v.**                                              **4:08-CV-01169-WRW**

**HARTFORD LIFE & ACCIDENT**                                                   **DEFENDANT**
**INSURANCE COMPANY**

**ORDER**

Pending are Plaintiff's and Defendant's cross Motions for Summary Judgment (Doc. Nos. 15, 18). Each side has responded.[1] For the reasons set out below, Plaintiff's Motion is GRANTED and Defendant's Motion is DENIED.

**I.      SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds.[2] The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[3]

The Court of Appeals for the Eighth Circuit has cautioned that summary judgment is an extreme remedy that should only be granted when the movant has established a right to the

---

[1]Doc. Nos. 21, 24.

[2]*Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56.

[3]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

judgment beyond controversy.⁴  Nevertheless, summary judgment promotes judicial economy by preventing trial when no genuine issue of fact remains.⁵  I must view the facts in the light most favorable to the party opposing the motion.⁶  The Eighth Circuit has also set out the burden of the parties in connection with a summary judgment motion:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*,"[to point] out to the District Court," that the record does not disclose a genuine dispute on a material fact.  It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion.  Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue.  If the respondent fails to carry that burden, summary judgment should be granted.⁷

Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.⁸

## II.    BACKGROUND⁹

Hartford issued to Dassault Falcon Jet Corporation ("Dassault") a group benefit plan with long-term disability benefits, policy number GLT-205509 (the "Plan"). The Plan provides that a claimant must satisfy five requirements to receive benefits:

---

⁴*Inland Oil & Transport Co. v. United States*, 600 F.2d 725, 727 (8th Cir. 1979).

⁵*Id.* at 728.

⁶*Id.* at 727-28.

⁷*Counts v. MK-Ferguson Co.*, 862 F.2d 1338, 1339 (8th Cir. 1988) (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)).

⁸*Anderson*, 477 U.S. at 248.

⁹Unless otherwise noted, the facts in this background section are taken from the parties' statements of material fact. Doc. Nos. 16, 19, 22, 26.

(1) You become Disabled while insured under this Plan; (2) You are Disabled throughout the Elimination Period; (3) You remain Disabled beyond the Elimination Period; (4) You are, and have been during the Elimination Period, under the Regular Care of a Physician; and (5) You submit Proof of Loss satisfactory to us.[10]

The Plan defines Disability or Disabled, in relevant part, as:

[D]uring the Elimination Period and for the next 24 months you are prevented by: (1) accidental bodily injury; (2) sickness; (3) mental illness; (4) substance abuse; or (5) pregnancy from performing one or more of the Essential Duties of Your Occupation, and as a result your Currently Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.

Under the Plan, Essential Duty is defined as a duty that "(1) is substantial, not incidental; (2) is fundamental or inherent to the occupation; and (3) cannot be reasonable omitted or changed."[11] "To be at work for the number of hours in your regularly scheduled workweek is also an Essential Duty."[12]

The Plan defines Your Occupation as "your occupation as it is recognized in the general workplace."[13] "Your Occupation does not mean the specific job you are performing for a specific employer or at a specific location."[14]

Under the Plan, the Elimination Period is the period of time the claimant must be Disabled before benefits become payable -- the last to be satisfied of "the first 90 consecutive day(s) of any one period of Disability; or with the exception of benefits required by state law, the

---

[10] Administrative Record ("AR") 043.

[11] AR 060, 146.

[12] *Id*.

[13] AR 065, 151.

[14] *Id*.

3

expiration of any Employer sponsored short term disability benefits or salary continuation program."[15]

Regular Care of a Physician means that the claimant is attended by a physician with medical training and clinical experience suitable to treat the disabling condition and whose treatment is "consistent with the diagnosis of the disabling condition; according to guidelines established by medical, research and rehabilitative organizations; and administered as often as needed, to achieve the maximum medical improvement."[16]

The Plan gives Hartford discretion to both determine eligibility and construe and interpret all terms and provisions of the Group Insurance Policy.

Dassault hired Plaintiff in November, 1975. Plaintiff became insured under the Plan on March 1, 2000. By 2006, Plaintiff worked for Dassault as a Senior Designer in its Avionics/Electrical Engineering Department. As a Senior Designer, Plaintiff had to have good hand/eye coordination, work at a computer for long periods of time, and, for liaison functions, climb into various areas of aircraft and climb stairs, among other functions.

Plaintiff's last day at work was May 12, 2006. In May, 2006, Plaintiff applied for long-term disability ("LTD") benefits under the Plan based on a claimed primary diagnosis of cerebrovascular arterial disease ("CVA," or, in other words, a stroke), and claimed secondary diagnoses of intermittent partial bowel obstruction and acute intermittent porphyria.

---

[15]AR 039, 125.

[16]AR 064, 150.

**A. Plaintiff's Medical History Before and After the Elimination Period**

On January 14, 2004, Plaintiff underwent a CT scan of her abdomen which revealed "[m]oderate small bowel distention, suggestive of small bowel obstruction. Postoperative change to the abdominal aorta."[17]

On March 9, 2004, Plaintiff had a left subclavia arteriography,[18] which demonstrated stenosis.[19] A 7mm stent was placed across the stenosis and deployed with inflation of an angioplasty balloon, with good angiographic result.[20]

Plaintiff saw Dr. Holland, Plaintiff's primary care physician, on February 14, 2005, because Plaintiff was suffering from a loss of vision. A 2-15-2005 noted "[c]hanges of subacute infarct in the left occipital lobe" -- *i.e.* Plaintiff had suffered a stroke. She returned to Dr. Holland on February 17, 2005, to discuss the results of her MRI. Plaintiff complained of congestion and cough during this visit, as well as memory loss. Plaintiff was referred for an arch aortogram, the results of which showed "minimal in-stent stenosis."

A February 24, 2005 carotid study summary reads, in part:

> On today's exam as seen on the prior arch aortogram there is atherosclerotic disease at the origin of the innominate artery that appear significant. Irregular plaque is present at the origin of the vessel that produces at least a mild-to-moderate degree of stenosis and is likely the source of embulus.
>
> There is a legion at the origin of the innominate artery producing moderate stenosis, likely source of emboli.

---

[17]AR 211.

[18]AR 210

[19]*Id.*

[20]*Id.*

Dr. Orsini, a cardiologist, saw Plaintiff on November 9, 2005, to follow up on an abdominal aortic aneurysm ("AAA") repair a year before. Dr. Orsini noted that "[i]t sounds like in February of this year, [Plaintiff] had a right eye stroke"[21] and that Plaintiff suffers from mild generalized confusion.

Between December 21, 2005, and February 21, 2006, Plaintiff visited Dr. Holland's office three times for upper respiratory problems, aches in her legs, and a swollen left arm after a fall.

Between May 12, 2006, to July 13, 2006, Dr. Holland saw Plaintiff in connection with nasal congestion and drainage, facial pain, left leg pain, and pain in her abdomen when she coughed. Plaintiff was diagnosed with sinusitis. On July 13, 2006, Dr. Holland diagnosed Plaintiff with meralgia paresthesias, a left abdominal wall hernia, CVA, porphyria, and "sleep," and adjusted Plaintiff's medications.

A May 2, 2007, note from Dr. Orsini shows that Plaintiff had a cardiolite stress test on September 12, 2006, and states that Plaintiff suffers from chronic severe back pains and could not walk enough for a diagnostic stress test.

Dr. Holland saw Plaintiff on September 13, 2006, for a sinus infection. On September 29, 2006, Dr. Holland noted that Plaintiff was slow to think [and] respond" and was "weak physically," and diagnosed Plaintiff with cerebrovascular disease, injury from CVA, porphyria, arteriosclerotic heart disease, and carotid bruit bilateral.

---

[21]AR 349.

**B. Plaintiff's Claim for LTD Benefits**

The Hartford received Plaintiff's claim for LTD benefits on June 9, 2006. The Attending Physician's Statement of Disability Form ("Physicians Statement"), which Dr. Holland completed on May 22, 2006, indicated that Plaintiff could not work because of cerebrovascular arterial disease, intermittent partial bowel obstruction, and acute intermittent porphyria. In the Physician's Statement, Dr. Holland noted Plaintiff's symptoms of memory loss, weakness, fatigue, and pain.[22]

In the Physician's Statement, Dr. Holland noted the following about areas of impairment: standing -- limited due to weakened legs; walking -- limited due to weakened legs; sitting -- ok; lifting/carrying -- limited due to weakened legs; reaching/working overhead -- limited due to weakened legs; pushing -- limited; pulling -- limited; driving -- ok; keyboard use/repetitive hand motion -- ok but general fatigue and memory lapses. With respect to psychiatric impairment, Dr. Holland placed a check mark next to the line reading "[m]oderate impairment in occupational functioning. Limited in performing some occupational duties."[23]   On June 13, 2006, Dr. Holland completed a Disability Management Solutions Medical Request Form ("Medical Request Form"), in which he diagnosed Plaintiff with CVA, intermittent partial bowel obstruction, acute intermittent porphyria, aspednia, peripheral vascular disease, and lupus. As

---

[22]AR 224.

[23]AR 225. Dr. Holland's other check-the-best-choice options were: (1) Indaquate information to make assessment; (2) essentially good functioning in all areas; (3) Occupationally and socially effective; (4) Slight difficulty in occupational functioning. Limited in performing some occupational duties; (5) Major impairment in several areas -- work, family relations. Avoidant behavior, neglects family, is unable to work; or (6) [illegible, but appears to read "Inability"] to function in almost all areas.

factors impairing Plaintiff's ability to return to work, Dr. Holland noted Plaintiff's fatigue, memory loss, muscle weakness, and pain in the side, back, and legs. Dr. Holland's treatment plan included physical therapy, specialty referrals to vascular surgeons, electrodiagnostic studies, and imaging studies. Dr. Holland's treatment plan also noted that Plaintiff had undergone surgery.[24]

In the Medical Request Form, Dr. Holland listed the following medications taken by Plaintiff related to her impairment or that impact Plaintiff's return to work: Tricor; Neurontin; Hydroxychloroquine; Altace; Plavix; Zestra; Zydone; Zyprexa; [Illegible]; Xanax; Protonix; and Atenolol.

A Hartford examiner, Brenda Sweeney, interviewed Plaintiff on June 27, 2006. During the interview Plaintiff indicated that she, among other things: had difficulty walking; had difficulty sleeping at night; had pain in her shoulders; had some memory loss from a stroke she suffered about six months earlier; could drive, perform light housework, and perform daily living activities; and wore two-pound weights on her legs to try to strengthen her muscles.

Defendant and Dr. Holland's office were in contact on multiple occasions in connection with Plaintiff's LTD benefits claim. It appears that Dr. Holland provided information about Plaintiff's condition, but that the information Defendant received was not, according to Defendant, enough to establish that Plaintiff was disabled as defined by the Plan. On September 15, 2006, Defendant denied Plaintiff's claim for failing to provide sufficient proof of loss ("POL"). In its September 15, 2006, denial letter, Defendant informed Plaintiff that to perfect her claim she needed to submit Dr. Holland's notes from May, 2006, through the date of the letter.

---

[24]AR 223.

In October, 2006, Defendant received information from Dr. Holland's office in connection with Plaintiff's claim, but the information Dr. Holland's office sent was information Defendant already had when it denied Plaintiff's claim in September, 2006 -- Dr. Holland's office did not send the records Defendant had requested. Defendant again denied Plaintiff's claim for LTD benefits on October 18, 2006. The October 18, 2006, letter cited a duplicate attending physicians statement and a phone call with "Derrek from Dr. Holland's office" -- in addition to documents cited in the September 15, 2006, denial letter -- as information Defendant consider in making its decision.

On January 2, 2007, Defendant received a letter from Plaintiff appealing Defendant's decision to deny her claim. On January 22, 2007, Defendant determined Plaintiff had submitted sufficient POL and overturned its denial. The appeal specialist reasoned that Dr. Holland had certified disability based on memory loss, muscle weakness, and fatigue due to multiple illnesses. The appeal specialist returned Plaintiff's claim to the claim office to determine her eligibility for benefit payments. On February 12, 2007, Melissa Chase, a registered nurse employed by Defendant, observed that while Plaintiff probably suffered a right-eye stroke in February, 2005, no recent diagnostic testing showed progression of the emboli.

Ms. Chase also noted that no medical records from May, 2006, forward showed that Plaintiff had an acute exacerbation of any of the diagnoses that would support her alleged restrictions, and that no medical records regarding functional abilities or lack of mental-status abilities supported Ms. Atkinson's complaints of memory loss. Ms. Chase concluded that "[t]he

severity of the symptoms noted and the lack of physical assessment does not provide for a disability that would be of such severity as to impact her ability to work."[25]

On February 12, 19, and 20, 2006, Ms. Chase tried to contact Dr. Holland for information to support Ms. Atkinson's alleged functional limitations. In a faxed letter sent on February 19, 2006, Ms. Chase requested that Dr. Holland provide clarification about Plaintiff's functional capacities. Ms. Chase explained that if she received no response by February 26, 2007, she would have to base her assessment of Plaintiff on the information currently in the file. Dr. Holland returned Ms. Chase's call when she was out of the office, but did not respond to Ms. Chase's request.

On March 2, 2007, Defendant denied Plaintiff's claim for LTD benefits. The denial letter informed Plaintiff that the medical information it received "did not address [her] current restriction[s] or limitations that [her] physician indicated [were] currently preventing [her] from working."[26] Defendant concluded that "[t]he combined information in your file does not show that you are unable to perform the Essential Duties of Your Occupation on a full time basis as of May 13, 2006. Because of this, we must deny your claim for LTD benefits."[27]

On May 2, 2007, Plaintiff appealed Defendant's denial of Plaintiff's LTD benefits. In support of her appeal, Plaintiff submitted a Physical Capacities Evaluation Form (the "Evaluation Form") that Dr. Holland completed on June 19, 2007. In the Evaluation Form, Dr. Holland diagnosed Plaintiff with CVA/cerebrovascular accident, small bowel obstruction on

---

[25]AR 018.

[26]AR 103.

[27]AR 104.

January 29, 2004, acute intermittent porphyria, systematic lupus erythematosis and, for the first time, AAA repair with spelenectomy on October 28, 2003, arterisoclerotic heart disease, sublavian steel syndrome, frozen shoulder syndrome, and fibromyalgia.

In the Evaluation Form, Dr. Holland indicated that Plaintiff could, in a general workplace environment, sit for two hours at a time up to six hours per day, stand for one hour at a time up to three hours per day, and walk for a quarter of an hour at a time up to two hours a day. Dr. Holland also noted that Plaintiff could occasionally -- 1 to 33% of the time -- drive, climb, stoop (bend at waist), crouch, kneel, and crawl, and that Plaintiff could occasionally lift up to ten pounds.

Defendant retained Dr. James Bress, a board-certified internal-medicine specialist, to provide an independent medical evaluation of Plaintiff's ability to perform "Your Occupation" as defined in the Plan. Dr. Bress did not examine Plaintiff, but reviewed Plaintiff's medical records and interviewed Dr. Holland about Plaintiff's physical capabilities. During the telephone call with Dr. Holland, Dr. Holland apparently indicated that Plaintiff had the capacity to do sedentary work. Dr. Bress reported that Dr. Holland believed that Plaintiff could work only part-time because "she lacked the stamina for full time work."[28] Dr. Bress reported that Dr. Holland noted that Plaintiff had memory and cognitive problems.

Dr. Bress concluded that "[Plaintiff] is very active. She is able to drive, goes to the office visits herself and on several office visits has noted no significant problems from the CVA."[29] Dr. Bress determined that the medical evidence in the record did not show that Plaintiff could

---

[28] AR 301.

[29] AR 302.

not perform full-time sedentary work due to pain, fatigue, or cognitive problems. Rather, Dr. Bress concluded that Plaintiff could sit for up to six hours a day, walk and stand occasionally, lift up to ten pounds, and had no restriction on the use of her hands.

On August 14, 2007, Janet Walsh, a certified rehabilitation counselor with Defendant, determined that Plaintiff had a sedentary occupation, and that the physical requirements of Plaintiff's position as a Senior Designer in the national economy fell within the restrictions indicated by Dr. Bress.

On August 14, 2007, Defendant denied Plaintiff's second appeal. Defendant based the decision on Plaintiff's medical records, Dr. Bress's opinion, and the determination that Plaintiff's occupation, as performed in the national economy, was sedentary. In its August 14, 2007, denial letter, Defendant concluded that "the documentation submitted [did] not support [Plaintiff's] Disability from Your Occupation as of May 12, 2006 through August 21, 2006 and beyond" and upheld the denial of the claim.[30]

## III. DISCUSSION

### A. Standard of Review

Under ERISA, "[a] civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits . . . ."[31] A denial of benefits under a plan governed by ERISA is to be reviewed *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms

---

[30] AR 286.

[31] 29 U.S.C. § 1132(a)(1)(B).

of the plan."[32] When an ERISA plan grants discretion, courts review a plan administrator's decision under an abuse of discretion standard.[33] A plan administrator's decision will be reversed under an abuse of discretion standard "'only if it is arbitrary and capricious.'"[34] When the insurance company "both determines whether an employee is eligible for benefit and pays benefits out of its own pocket," there is a conflict of interest, which should be taken into consideration when determining whether there was an abuse of discretion.[35]

Because the Plan in this case grants discretion, the abuse of discretion standard applies here.

### B. Defendant's Decision to Deny Plaintiff's LTD Benefits

As set out above, a plan administrator's decision will be reversed under an abuse of discretion standard "'only if it is arbitrary and capricious.'"[36] According to Webster's Dictionary, arbitrary means based on impulse or whim;[37] capricious means characterized by or subject to whim.[38] A plan administrator's decision "need be only reasonable, meaning that it must be supported by substantial evidence."[39] A plan administrator's decision need not give more weight

---

[32] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[33] *Jessup v. Alcoa*, 481 F.3d 1004, 1006 (8th Cir. 2007).

[34] *Groves v. Metro. Life Ins. Co.*, 438 F.3d 872, 874 (8th Cir. 2007) (quoting *Herbert v. SBC Pension Benefit Plan*, 354 F.3d 796, 799 (8th Cir. 2004)).

[35] *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346 (2008).

[36] *Groves*, 438 F.3d at 874.

[37] WEBSTER'S NEW RIVERSIDE DICTIONARY 37 (Revised Edition 1996).

[38] WEBSTER'S NEW RIVERSIDE DICTIONARY 106 (Revised Edition 1996).

[39] *Alexander v. Trane Co.*, 453 F.3d 1027, 1031 (8th Cir. 2006).

to a treating physician's opinion.[40] Peer review of a treating physician's records is an accepted method of review.[41] If a plan administrator's decision is based on relevant evidence that a reasonable person could find supports the conclusion, the decision should be upheld.[42]

In a nutshell, Defendant contends its decision to deny Plaintiff's LTD benefits was based on a lack of objective evidence that any of Plaintiff's diagnosed conditions support Plaintiff's alleged restrictions.[43] I disagree.

Plaintiff suffered a stroke in February, 2005. Dr. Holland's notes indicate that Plaintiff began complaining of memory loss about the time she suffered her stroke. Dr. Orsini's 2005 notes also indicate that Plaintiff suffers from mild generalized confusion. The February 24, 2005, carotid study stated that "there is atherosclerotic disease . . . that appear[s] signficant."[44] Dr. Holland's May 22, 2006, Physician's Statement included as factors impairing Plaintiff's ability to return to work: Plaintiff's fatigue; memory loss; muscle weaknes;, and pain in the side, back, and legs. Dr. Holland listed Plaintiff's medications on the Physician's Statement, and those medications are consistent with pain treatment, treatment of heart disease, and prevention of stroke. Dr. Holland's office-visit notes during the Elimination Period[45] indicate Plaintiff complained of leg pain, and that Plaintiff was taking the same plethora of medications that she

---

[40]See *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003).

[41]See *Dillard's Inc. v. Liberty Life Assur. Co.*, 456 F.3d 894 (8th Cir. 2006); *Weidner v. Fed. Express Corp.*, 492 F.3d 925 (8th Cir. 2007).

[42]See *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994 (8th Cir. 2005).

[43]Doc. No. 17.

[44]AR 348.

[45]90 consecutive days of any one period of disability.

had been previously. Dr. Holland's office-visit notes after the Elimination Period include the same medications, and indicate that Plaintiff is slow to think and respond, as well as being weak.

Ms. Sweeney's interview of Plaintiff showed that Plaintiff was able to perform the activities of daily living, such as driving and light housework. It seems to me that being able to care for oneself with respect to daily living does not preclude being disabled as defined by the plan. The fact that Plaintiff said she wore weights to strengthen her legs seems to support Plaintiff's claims that her legs are weak.

As set out above, Dr. Holland indicated that Plaintiff could, in a general workplace environment, sit for two hours at a time up to six hours per day, stand for one hour at a time up to three hours per day, and walk for a quarter of an hour at a time up to two hours a day. Dr. Holland also noted that Plaintiff could on occasion -- 1 to 33% of the time -- drive, climb, stoop (bend at waist), crouch, kneel, and crawl, and that Plaintiff could occasionally lift up to ten pounds. Dr. Holland felt that Plaintiff could work four-hour days.

Dr. Bress's peer review found that Plaintiff could sit six hours out of an eight hour day, walk occasionally, stand, lift up to 10 pounds, and use her hands with no restriction. At first blush, Dr. Bress's and Dr. Holland's conclusions appear to be similar. Dr. Bress, however, then determined that Plaintiff is "very active."[46] Dr. Bress apparently based this conclusion on the fact that "[Plantiff] is able to drive, goes to office visits herself and on several office visits has noted no significant problems from the CVA." There is nothing in the record to support a finding that Plaintiff is "very active." The mere fact that Plaintiff is able to drive does not mean she is very active. Dr. Bress also concluded that "[Plaintiff] is able to drive with the visual problems and she

---

[46]AR 302.

is certainly able to work a sedentary occupation."[47] It is capricious to find that being able to drive means being able to work full-time in a sedentary occupation.

Defendant would like to know what worsened between the time of Plaintiff's stroke (and other diagnoses) and the time Plaintiff claimed LTD benefits that would prevent her from working -- since Plaintiff worked a year following her stroke. It seems to me that, considering the facts specific to this case, the question should be what about Plaintiff's condition improved so that she could work.

## CONCLUSION

The medical documentation in this case is not extensive. Dr. Holland's and Dr. Orsini's notes support Plaintiff's claims. The record does not support Dr. Bress's findings. I must also consider as a factor that Defendant both determines and pays benefits, and thus has an incentive to deny claims. Considering all of these factors together, Defendant's decision to deny Plaintiff's LTD benefits was arbitrary and capricious. Accordingly, based on the finding of fact and conclusions of law above, Defendant's Motion for Summary Judgment (Doc. No. 15) is DENIED and Plaintiff's Motion for Summary Judgment (Doc. No. 18) is GRANTED.

IT IS SO ORDERED this 7th day of May, 2009.

/s/ Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE

---

[47]AR 301.